# EXHIBIT 1

 

April 25, 2019

Office of the General Counsel (original)
U.S. Department of Homeland Security
Washington, DC 20528

Scott K. Falk, Chief Counsel (copy)
U.S. Customs and Border Protection
1300 Pennsylvania Avenue NW
Washington, DC 20229

Chief Patrol Agent Henry Rolon (copy)
U.S. Customs and Border Protection
Spokane Sector Headquarters
10710 N. Newport Highway
Spokane, WA 99218

**Re:   Notification of Incident and Claim for Damages under the Federal Tort Claims Act
Muhanad SALEH, AKA Mohanad ELSHIEKY, ▮▮▮▮8-221 (DOB: ▮▮▮▮1991)**

Our offices represent Muhanad Saleh, A.K.A. Mohanad Elshieky (Mr. Elshieky) in his claim against U.S. Customs and Border Protection (CBP), a subdivision of the U.S. Department of Homeland Security (DHS). Enclosed please find the Claim for Damage, Injury, or Death (Standard Form 95) (Ex. A), and Mr. Elshieky's authorization statement (Ex. B).

Pursuant to 28 U.S.C. § 2675(a) and 28 C.F.R. § 14.2(a), we hereby provide notification of an incident that occasions liability under the Federal Tort Claims Act ("FTCA") and present a demand for monetary damages in the amount of $250,000 resulting from CBP and ICE agents' tortious conduct, including (1) false imprisonment; and (2) false arrest.

As explained below, CBP officers unlawfully detained Mr. Elshieky without justification, and on the basis of legally prohibited grounds. In short, CBP singled out Mr. Elshieky for inspection based on his race while Mr. Elshieky was on board a bus at a bus stop in Spokane, Washington. The officers then detained Mr. Elshieky, forcing him off the bus, despite lacking a reasonable suspicion that he did not have lawful immigration status. Moreover, despite producing valid papers reflecting his identity and lawful legal presence, the officers continued to unlawfully detain Mr. Elshieky. As a direct and proximate result of CBP's unlawful conduct, Mr. Elshieky suffered significant emotional and financial harm.

I. **CBP's Unlawful Seizure and Detention of Mr. Elshieky**

On January 27, 2019, Mr. Elshieky arrived at the Spokane Intermodal Center in Spokane, Washington, on a bus from Pullman, Washington. His bus arrived shortly after 8:00 in the morning, and Mr. Elshieky was scheduled to take a second bus from Spokane to Portland at around 11:30 that morning (Ex. C). The second bus arrived around 11:15 AM. During the layover, Mr. Elshieky waited at the bus station and left briefly to buy breakfast.

After his bus to Portland arrived, Mr. Elshieky joined other passengers in a line for boarding. He then placed his baggage under the bus, entered the bus, and took a seat near the back, next to the window. A few minutes later, two Customs and Border Protection officers boarded the Greyhound bus. Mr. Elshieky had not seen any CBP officers prior to boarding, and initially assumed the officers were Greyhound employees, matching passengers' IDs to their tickets. After boarding, one officer stood at the front of the bus near the bus driver, while the other officer began moving quickly towards the back of the bus. The officer did not question everyone on board. Mr. Elshieky then observed the CBP officer questioning a man who appeared to be Hispanic sitting nearby. The CBP officer permitted that man to remain on the bus after he produced a U.S. passport. In addition, two other people of color were forced to exit the bus after the CBP officer questioned them.

When the CBP officer arrived at Mr. Elshieky's seat, the officer asked Mr. Elshieky for identification. Mr. Elshieky produced his valid, unexpired Oregon state driver's license (Ex. D). The State of Oregon requires proof of lawful presence in the United States before providing a driver's license to its residents. Or. Rev. Stat. § 807.021(1). Nevertheless, after reviewing Mr. Elshieky's license, the CBP officer asked whether Mr. Elshieky was a U.S. citizen. Mr. Elshieky responded that he was not a citizen, and at this point, the officer's demeanor shifted. He placed one hand on the seat in front of Mr. Elshieky, and another on the seat beside him, blocking Mr. Elshieky's exit and restraining his movement from the seat. The officer then asked if Mr. Elshieky had a passport, and Mr. Elshieky responded that he did not have one with him. After hearing his response, the officer inquired whether Mr. Elshieky had any other form of identification, and Mr. Elshieky began to produce his original employment authorization document (EAD) issued by U.S. Citizenship and Immigration Services ("USCIS") (Ex. E). However, the officer then ordered that Mr. Elshieky follow him off the bus, without even reviewing this second form of identification.

Once off the bus, Mr. Elshieky provided his EAD to the CBP officer who had questioned him. Other officers stood nearby, questioning the two other individuals ordered off of the bus; in total, about five or six CBP officers stood nearby. Mr. Elshieky then began to explain his legal status to the CBP officer who questioned him on the bus and to one other officer. He informed them that he was lawfully present in the United States, as he had arrived in the United States on a J1 visa in 2014. He explained that he then applied for asylum, and that USCIS had recently granted him asylum in October 2018 (Ex. F). The officers then asked Mr. Elshieky if he had his asylum approval document with him. He informed the officers that he does not carry the approval notice, but pointed out that he had a valid, USCIS-issued EAD based on his asylum application, with all his information on it. Instead of acknowledging the valid work permit, the officers retorted that "illegals fake these [documents] all the time and use them." Mr. Elshieky tried again to explain

his status to the officers, but they disparagingly dismissed his explanations, claiming that "we've heard this all before" and that "illegals say that all the time."

After Mr. Elshieky repeated that he was lawfully present in the United States, the second CBP officer took the EAD and made a phone call. Mr. Elshieky was unable to hear the entire conversation, but he heard the CBP officer reading off his information to the person on the other end of the line. He was also able to hear that the person on the phone verified that some record of Mr. Elshieky was in the system. However, after the phone call ended, the second CBP officer claimed that there were no records of Mr. Elshieky's asylum grant, and that all they knew was that Mr. Elshieky arrived on a now-expired J1 visa.

Mr. Elshieky responded by once again informing the officers that USCIS had granted him asylum in October 2018, but the officers insisted there were no records of his grant of asylum, ignoring the obvious evidence presented by the EAD. Mr. Elshieky gave up trying to convince the officers about his status, and instead stated that he wished to speak to his lawyer and wanted his paperwork back. In response, the first CBP officer—the one who initially detained Mr. Elshieky on the bus—yelled at Mr. Elshieky to take his hands out of his pockets. Mr. Elshieky complied, but sensed that the officers' frustration was growing as he attempted to assert his lawful status and rights. As a result, he became quiet. The officers then consulted one another, whispering for a time. At the end of their conversation, the officers informed Mr. Elshieky that they would "let him go this time," implying that they were doing him a favor—even though Mr. Elshieky was at all times lawfully present and the CBP officials had no grounds to detain him.

The CBP officers' detention of Mr. Elshieky lasted around twenty minutes. After the officers let him go, Mr. Elshieky boarded the bus, which by now was late, waiting for the CBP officers to conclude their interrogation. The bus immediately left after Mr. Elshieky boarded for the second time.

## II. CBP Is Liable for False Arrest and False Imprisonment under the Federal Tort Claims Act

The CBP officers committed false arrest and false imprisonment of Mr. Elshieky when they restrained him, restricted his freedom of movement, and compelled him to move without legal authority. Restraint and imprisonment can be established by threat of force or by conduct reasonably implying that force will be used. First, CBP officers blocked Mr. Elshieky's movement by preventing his exit from his seat on the bus during their interrogation. To do so, the CBP officer placed his hands on the seats in front of and beside Mr. Elshieky, making clear that Mr. Elshieky was not free to leave or stop answering the officer's questions. Second, the CBP officers continued to make clear that Mr. Elshieky could not terminate the encounter, leave the situation, or get back on the bus by ordering Mr. Elshieky to disembark the bus and questioning him further outside the bus.

Moreover, the officers did so without legal authority. Once Mr. Elshieky informed the CBP officer on the bus that he was not a citizen, the officer blocked Mr. Elshieky's exit and requested further identification. But after Mr. Elshieky produced an original, valid EAD issued by USCIS, CBP officers continued to hold Mr. Elshieky for nearly 20 minutes. Without any evidence

whatsoever, the officers insinuated that Mr. Elshieky was "illegal" and claimed that he was making up his immigration story because "illegals say that all the time." Moreover, the officers' actions appear motivated in part by race: CBP officers questioned whether Mr. Elshieky was a U.S. citizen even after he provided his valid Oregon driver's license. Acquiring his license required Mr. Elshieky to provide proof of lawful presence, and thus provided no reason for the CBP officer to subsequently question Mr. Elshieky about his citizenship. Finally, the CBP officer on the bus seized Mr. Elshieky without reasonable suspicion of unlawful presence. The documents Mr. Elshieky provided to the CBP officers further demonstrate the absence of reasonable suspicion that Mr. Elshieky was unlawfully present in the United States. The CBP officers therefore lacked any authority to restrain Mr. Elshieky's movements.

### III.     FTCA Damages

As a direct result of the CBP officers' actions, Mr. Elshieky suffered significant emotional harm. At the time of the seizure, Mr. Elshieky feared that he could be unlawfully deported and was afraid that he would be unable to contact anyone for assistance. Shaken by the officers' actions, Mr. Elshieky burst into tears when he re-boarded the bus and considered the frightening events that had just occurred.

The events of that day have also produced lasting emotional trauma for Mr. Elshieky. Mr. Elshieky believed that obtaining asylum would end his fear of returning to Libya. Instead, the officers' actions have resulted in recurring nightmares for Mr. Elshieky that continue to this day. The events of January 27, 2019, also reignited Mr. Elshieky's symptoms of post-traumatic stress disorder, making him fearful once more that he might end up in Libya, unable to flee to safety in the United States.

Moreover, in the two weeks immediately following the incident, Mr. Elshieky had to cancel several of his shows as a professional comedian. After trying to do one show, Mr. Elshieky realized that the emotional trauma that he experienced on January 27 made him unable to perform effectively. In addition, Mr. Elshieky publicized the CBP officers' action shortly after the incident, frustrated at the unlawful and degrading treatment that he had received. After publicizing these wrongful activities, Mr. Elshieky became the target of hateful, xenophobic, and smearing messages that exacerbated the emotional harm he experienced because of the officers' actions.

In addition, the CBP officers' actions offended Mr. Elshieky's sense of dignity and belonging. Despite having finally obtained asylum—and the safety that status provides—CBP officers treated Mr. Elshieky as someone without rights and without a voice. Instead, they profiled him as an "illegal," disregarded his valid, original documentation, and disparaged his repeated attempt to detail his lawful status.

### IV.     Potential Constitutional Claims

In addition to the above-mentioned torts, the government's conduct may be characterized as violating the right to be free of unreasonable searches and seizures under the Fourth Amendment of the U.S. Constitution, and under Article I, Section 7 of the Washington State Constitution.

CBP agents seized and detained Mr. Elshieky even after he produced (1) government-issued identification that requires evidence of lawful presence in the United States, and (2) a second document issued by the Department of Homeland Security that demonstrates lawful presence in the United States. The officers then proceeded to ignore Mr. Elshieky's repeated pleas that he had asylum status, instead branding him an "illegal" without any basis whatsoever. Mr. Elshieky may allege these constitutional violations in addition to the FTCA claims described above.

\* \* \*

CBP officers detained Mr. Elshieky after approaching him based on his race, and despite Mr. Elshieky's production of valid identification that evidenced his lawful presence in the United States. That detention results in liability under the Federal Tort Claims Act, and likely violates Mr. Elshieky's Fourth Amendment and state constitutional rights. As a consequence, Mr. Elshieky suffered significant emotional trauma and financial loss. For these reasons, Mr. Elshieky submits this claim under the FTCA for compensation in the amount of $250,000.

If you have any questions, please do not hesitate to contact us.

Sincerely,

Matt Adams
Leila Kang
Aaron Korthuis
NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Tel: (206) 957-8611
Fax: (206) 587-4025

Lisa Nowlin
Eunice Hyunhye Cho
AMERICAN CIVIL LIBERTIES UNION OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
Tel: (206) 624-2184

## **LIST OF EXHIBITS**

A. FTCA Claim Form, Standard Form 95, dated April 19, 2019

B. Claim Form Authorization Statement, dated March 27, 2019

C. Screenshot of Mr. Elshieky's Bus Ticket

D. Copy of Mr. Elshieky's Oregon Driver's License

E. Copy of Mr. Elshieky's Employment Authorization Document

F. Copy of USCIS Order Granting Mr. Elshieky Asylum, dated October 22, 2018

# EXHIBIT A

Case 2:20-cv-00064    ECF No. 1-1    filed 02/14/20    PageID.24    Page 8 of 20

| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 |
|---|---|---|

| 1. Submit to Appropriate Federal Agency: | 2. Name, address of claimant, and claimant's personal representative if any. (See instructions on reverse). Number, Street, City, State and Zip code. |
|---|---|
| See attached letter | Mohanad Elshieky, <br><br> See attached letter for counsel's information |

| 3. TYPE OF EMPLOYMENT <br> ☐ MILITARY ☒ CIVILIAN | 4. DATE OF BIRTH <br> 1991 | 5. MARITAL STATUS | 6. DATE AND DAY OF ACCIDENT <br> 01/27/2019 | 7. TIME (A.M. OR P.M.) <br> 11:30 am |
|---|---|---|---|---|

8. BASIS OF CLAIM (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof. Use additional pages if necessary).

See attached letter

9. PROPERTY DAMAGE

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, Street, City, State, and Zip Code).

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF THE DAMAGE AND THE LOCATION OF WHERE THE PROPERTY MAY BE INSPECTED. (See instructions on reverse side).

10. PERSONAL INJURY/WRONGFUL DEATH

STATE THE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE THE NAME OF THE INJURED PERSON OR DECEDENT.

See attached

11. WITNESSES

| NAME | ADDRESS (Number, Street, City, State, and Zip Code) |
|---|---|
| Unknown CBP officers <br> Unknown bus passengers and driver | |

12. (See instructions on reverse). AMOUNT OF CLAIM (in dollars)

| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY <br> 250,000.00 | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights). <br> 250,000.00 |
|---|---|---|---|

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE INCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM.

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side). | 13b. PHONE NUMBER OF PERSON SIGNING FORM | 14. DATE OF SIGNATURE <br> 4-19-19 |
|---|---|---|

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the Government. (See 31 U.S.C. 3729). | Fine, imprisonment, or both. (See 18 U.S.C. 287, 1001.) |

Authorized for Local Reproduction
Previous Edition is not Usable
95-109

NSN 7540-00-634-4046

STANDARD FORM 95 (REV. 2/2007)
PRESCRIBED BY DEPT. OF JUSTICE
28 CFR 14.2

| INSURANCE COVERAGE |
|---|
| In order that subrogation claims may be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of the vehicle or property. |
| 15. Do you carry accident Insurance?  [ ] Yes   If yes, give name and address of insurance company (Number, Street, City, State, and Zip Code) and policy number.  [ ] No <br> Not applicable |
| 16. Have you filed a claim with your insurance carrier in this instance, and if so, is it full coverage or deductible?  [ ] Yes  [ ] No   17. If deductible, state amount. <br> Not applicable |
| 18. If a claim has been filed with your carrier, what action has your insurer taken or proposed to take with reference to your claim? (It is necessary that you ascertain these facts). <br> Not applicable |
| 19. Do you carry public liability and property damage insurance?  [ ] Yes   If yes, give name and address of insurance carrier (Number, Street, City, State, and Zip Code).  [ ] No <br> Not applicable |

## INSTRUCTIONS

**Claims presented under the Federal Tort Claims Act should be submitted directly to the "appropriate Federal agency" whose employee(s) was involved in the incident. If the incident involves more than one claimant, each claimant should submit a separate claim form.**

Complete all items - Insert the word NONE where applicable.

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR LEGAL REPRESENTATIVE, AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR MONEY DAMAGES IN A **SUM CERTAIN** FOR INJURY TO OR LOSS OF PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT. THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY WITHIN **TWO YEARS** AFTER THE CLAIM ACCRUES.

**Failure to completely execute this form or to supply the requested material within two years from the date the claim accrued may render your claim invalid. A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.**

If instruction is needed in completing this form, the agency listed in item #1 on the reverse side may be contacted. Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14. Many agencies have published supplementing regulations. If more than one agency is involved, please state each agency.

The claim may be filled by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with the claim establishing express authority to act for the claimant. A claim presented by an agent or legal representative must be presented in the name of the claimant. If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.

If claimant intends to file for both personal injury and property damage, the amount for each must be shown in item number 12 of this form.

The amount claimed should be substantiated by competent evidence as follows:

(a) In support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of the injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

(b) In support of claims for damage to property, which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

(c) In support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident. Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

*(d)* **Failure to specify a sum certain will render your claim invalid and may result in forfeiture of your rights.**

## PRIVACY ACT NOTICE

This Notice is provided in accordance with the Privacy Act, 5 U.S.C. 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached.
 A. *Authority:* The requested information is solicited pursuant to one or more of the following: 5 U.S.C. 301, 28 U.S.C. 501 et seq., 28 U.S.C. 2671 et seq., 28 C.F.R. Part 14.

B. *Principal Purpose:* The information requested is to be used in evaluating claims.
C. *Routine Use:* See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.
D. *Effect of Failure to Respond:* Disclosure is voluntary. However, failure to supply the requested information or to execute the form may render your claim "invalid."

## PAPERWORK REDUCTION ACT NOTICE

This notice is solely for the purpose of the Paperwork Reduction Act, 44 U.S.C. 3501. Public reporting burden for this collection of information is estimated to average 6 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Director, Torts Branch, Attention: Paperwork Reduction Staff, Civil Division, U.S. Department of Justice, Washington, DC 20530 or to the Office of Management and Budget. Do not mail completed form(s) to these addresses.

STANDARD FORM 95 REV. (2/2007) BACK

# EXHIBIT B

Claim Authorization Statement

I, Muhanad Saleh, am represented by attorneys at the American Civil Liberties Union Foundation of Washington (ACLU-WA) and the Northwest Immigrant Rights Project (NWIRP). I authorize the ACLU-WA and NWIRP to submit a claim letter on my behalf to the Department of Homeland Security (DHS) and Customs and Border Protection (CBP), and any other government agency, requesting compensation for the events surrounding my detention by CBP and the harm that action caused.

_____            03/27/2019
Muhanad Saleh                                       Date

# EXHIBIT C






https://www.greyhound.com

## NORTHWESTERN TRAILWAYS, INC

ECONOMY

PRINT TICKET

0735

Boarding # 5

GATE # - CHECK AT STATION

PASSENGER
SALEH MUHANAD

DEPARTING @ 7:05 AM
Pullman, WA

ARRIVING @ 8:30 AM
Spokane, WA

SCHEDULE#
NWL0735

LEAVING ON
Sun Jan 27 2019

BOARDING AT
6:45 am

**This part of your trip will be with our partner bus company, NORTHWESTERN TRAILWAYS, INC. Some of our partner carriers are unable to honor priority boarding, but you'll still get all the other great perks that come with your chosen fare**

Tariff: PRO-ECON Tax: 0001179 81 of 426 0006200 0260129005479844 0260129005479844

CONFIRMATION # 18044771

TRIP ORIGIN
Pullman, WA

TRIP DESTINATION
Portland, OR

TRIP TICKET
1 of 2

Tariff: PRO-ECON Tax:
0001179 81 of 426 0006200

0260129005479844

0260129005479844

All customers agree to all terms and conditions found at www.greyhound.com. Seating aboard vehicles is without regard to race, color, creed, religion, gender, national origin or physical ability. For help, please call (800) 231-2222

## NORTHWESTERN TRAILWAYS, INC

ECONOMY

PRINT TICKET

6911

Boarding # 23

GATE # - CHECK AT STATION

PASSENGER
SALEH MUHANAD

DEPARTING @ 11:35 AM
Spokane, WA

ARRIVING @ 6:05 PM
Portland, OR

SCHEDULE#
GLI6911

LEAVING ON
Sun Jan 27 2019

BOARDING AT
11:15 am

Tariff: PRO-ECON Tax: 0005021 345 of 426 0006200 0260229005479844 0260229005479844

CONFIRMATION # 18044771

TRIP ORIGIN
Pullman, WA

TRIP DESTINATION
Portland, OR

TRIP TICKET
2 of 2

Tariff: PRO-ECON Tax:
0005021 345 of 426 0006200

0260229005479844

0260229005479844

All customers agree to all terms and conditions found at www.greyhound.com. Seating aboard vehicles is without regard to race, color, creed, religion, gender, national origin or physical ability. For help, please call (800) 231-2222

# EXHIBIT D



# EXHIBIT E



# EXHIBIT F

**DEPARTMENT OF HOMELAND SECURITY** USCIS OMB No. 1651-0111
U.S. Customs and Border Protection

**Departure Record**

Admission Number

776770373 33

221

ASYLUM STATUS
Granted Indefinitely
Section 208
Immigration and Nationality Act

OCT 22 2018

024

18. Family Name
SALEH

19. First (Given) Name
MUHANAD M AHMOUDA                    1991

LIBYA  Citizenship

CBP Form I-94 (05/08)

STAPLE HERE

See Other Side